AO 106 (Rev. 04/10)  Application for a Search Warrant

AUSA Jessica Kim

FILED
RICHARD W. NAGEL
CLERK OF COURT

2018 OCT -4  AM 10: 48

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
Apple iPhone 6S, IMEI #359486085729315 )
currently located at )
Columbus Division of Police property room )

Case No.  2:18 mj 754

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B and/or attached Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 242 | Deprivation of rights under color of law |
| 18 U.S.C. 1951 | Hobbs Act extortion |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert D. Bogner, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  10-4-18

_____
*Judge's signature*

City and state:  Columbus, Ohio

Hon. Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. **2 : 1 8 mj 7 5 4** |
| Apple iPhone 6S<br>IMEI #359486085729315 | |
| CURRENTLY LOCATED AT<br>COLUMBUS DIVISION OF POLICE<br>PROPERTY ROOM | **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Robert D. Bogner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am an Inspector with the Ohio Auditor of State (AOS), where I have worked since February 2015. As an AOS Inspector, I am responsible for conducting criminal investigations involving theft, theft in office, public corruption, and other violations of law. Since February 2017, I have been deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI), Columbus Resident Agency for the Southern District of Ohio, Eastern Division.  I am currently assigned to the Public Corruption Squad.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C.

§ 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      Prior to working as an AOS Inspector, I was a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) for 28 years. During that time, I investigated violations of the Internal Revenue laws and related offenses and was involved in numerous investigations involving violations of the United States Code. I have provided financial investigative expertise and assistance to various federal and local agencies, including the FBI, Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, and Firearms (ATF), and the Columbus Division of Police Narcotics Bureau.

4.      During my tenure as a Task Force Officer with the FBI, I have been assigned to work on various types of investigations, including public corruption, financial crimes, violent crimes, narcotics offenses, and money laundering. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

5.      I, along with other agents and officers from the FBI, the Columbus Division of Police (CPD), the Ohio Bureau of Criminal Investigation (BCI), and the Ohio Auditor of State (AOS), have been investigating corruption in the Columbus Division of Police Department's Vice Unit involving CPD Vice Unit Detective Andrew K. Mitchell. Over the course of this investigation, I have become familiar with the organization and structure of the CPD Vice Unit, as well as the nature and scope of the CPD Vice Unit's duties.

6.      The facts set forth below are based upon my own observations and experience

2

with this investigation, as well as investigative reports and information provided to me by other federal and state law enforcement officers. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an Apple iPhone 6S, IMEI #359486085729315, hereinafter the "Device." The Device is currently located at the Columbus Division of Police property room in Columbus, Ohio.

8.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.      Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses; (ii) investigative reports and arrest records; (iii) federal and state law enforcement officers; (iv) public database searches; and (v) the ongoing investigation of the CPD Vice Unit in this district, there is probable cause to believe that violations of 18 U.S.C. § 242 (deprivation of rights under color of law) and 18 U.S.C. § 1951 (Hobbs Act extortion) have been committed by CPD Vice Unit Detective Andrew K. MITCHELL. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

3

**Background of Target**

10.    Andrew K. MITCHELL has been a CPD officer since 1987.  During his tenure as a police officer with CPD, MITCHELL has held a number of investigative assignments, including serving as a detective in the Homicide Section (from March 2012 to May 2015) and the Vice Unit.  MITCHELL is currently assigned as a detective in the Vice Unit, and has been in this assignment since March 12, 2017.  During at least 2002, 2004, and 2005, MITCHELL was sworn in as a Deputy Sheriff with the Franklin County Sheriff's Office.

11.    As secondary employment, MITCHELL owns and manages numerous rental properties, the duties of which include maintenance and bookkeeping.  Since the 1990s, Mitchell has owned at least 40 properties in the Central Ohio area, which he operates as apartments for rent.

**Operational Background of CPD Vice Unit**

12.    The CPD Vice Unit is charged with enforcing, among other things, prostitution-related offenses.  Many of these offenses are misdemeanor violations under the Ohio Revised Code.  Because of the nature of the offenses, and the types of crimes being investigated, CPD Vice Unit detectives are given a broad amount of latitude while performing their duties, including working alone in their respective on-duty vehicles.

13.    Your Affiant is aware of the following CPD procedure for prostitution-related offenses: Once a CPD Vice Unit detective decides to take an enforcement action (*e.g.*, picking up a suspected prostitute for potential arrest), the CPD Vice Unit detective is supposed to radio for his/her partner or another backup officer, as well as begin audio recording within the vehicle.  If the CPD Vice Unit detective determines that the elements are met for the offense of prostitution,

the policy is to detain and transport the subject to a common location with other Vice Unit officers for the processing of paperwork. This location may be a parking lot or a fixed structure. If there are no outstanding warrants for the subject's arrest, the subject is given a summons and then released. If there are outstanding warrants for the subject's arrest, arrangements are made for the subject to be transported to a local correctional facility.

### Criminal Investigation Involving Witness 1

14. On or about September 6, 2018, investigators received information from individuals overseeing the Franklin County Municipal Court's Changing Actions to Change Habits (CATCH) program indicating that serious crimes were being committed by a CPD officer.

15. On or about September 7, 2018, investigators interviewed Witness 1, a CATCH court participant who was willing to speak to law enforcement to report a sexual assault. Witness 1 disclosed she had been a prostitute in the past and was currently in the CATCH court program.

16. While working as a prostitute in the late summer to early fall of 2017, Witness 1 voluntarily entered a vehicle with the intent to engage in a sex act in exchange for money. Witness 1 described the vehicle as a Jeep-like, medium-sized SUV, similar to a Lincoln Navigator, with leather interior (color unknown) and a grab handle in the back. After Witness 1 and the man operating the vehicle negotiated a price for sex, the man pulled out a law enforcement badge, identified himself as a Vice Officer, asked if she was a cop, and then asked if she had active warrants for her arrest. Witness 1 recalled that the man asked for her name, date of birth, and then ran her for active warrants using one of his two cell phones. Witness 1 also

5

recalled that the man was wearing black or blue basketball shorts with a gray or white line down the sides and a matching shirt. The man, who was light-skinned African-American, drove to a small park off of Briggs Road in Columbus (believed by your Affiant to be Lindbergh Park) and told Witness 1 that if she did not want to go to jail, she was going to have sex with him. Witness 1 agreed to have sex with the man because she did not want to go to jail, knowing that she had active warrants and was in possession of needles and a crack pipe.

17.     Witness 1 then got into the back seat of the vehicle, followed by the man. When told to reach behind her, Witness 1 complied, thinking that the man wanted her to grab his penis. The man, however, placed one handcuff on her wrist and then fastened the other handcuff to the grab handle over the passenger side rear door, at which point the man pulled down Witness 1's pants and began having vaginal sex with her. During vaginal sex, the man bit Witness 1's back, pulled her hair really hard, and was generally very rough with her. When he was finished, the man drove Witness 1 to a drug house to the area of Wayne Avenue and Mound Street where he allowed her to exit the vehicle. Initially, Witness 1 did not think the man who sexually assaulted her was actually a police officer. After the assault, however, Witness 1 spoke to other prostitutes in the drug house who warned her about the "light-skinned black man."

18.     A search of the Ohio Law Enforcement Gateway (OHLEG) database reveals that a black 2015 Lincoln Navigator, VIN #5LMJJ2JT1FEJ01610, Ohio license plate number GLX6189, is registered to MITCHELL's wife, Tanya Mclymont Mitchell, at 6249 Howard Road Sunbury, Ohio 43074. This vehicle has significant similarities to the vehicle described by Witness 1 used in the late summer/early fall of 2017 sexual assault.

19.     After the assault, Witness 1 was on the street working as a prostitute when she had an interaction with another prostitute, Witness 2. As a car drove past them, Witness 2

6

pointed to the car and warned Witness 1 not to enter the vehicle because the driver was a CPD

Vice Unit Detective named "Andy Mitchell." Witness 2 told Witness 1 that "Detective

Mitchell" might take you to jail or make you have sex with him instead of being arrested.

Witness 2 said she knew the officer's name because he had written her a summons for Soliciting.

(Your Affiant is aware that CPD records and the Franklin County Correctional Center

management system indicate that MITCHELL issued a summons to Witness 2 on a specific date,

which is documented by a numbered CPD report.)

20.     In or around June or July of 2018, Witness 1 was working as a prostitute when

she voluntarily entered a vehicle with the intent of exchanging a sex act for money. Upon

entering the vehicle, Witness 1 realized the driver was the same man that sexually assaulted her

in the fall of 2017 and the person that Witness 2 had identified as CPD Vice Unit Detective

Andrew MITCHELL. Witness 1 told investigators that MITCHELL was not driving the same

vehicle as the day of the first assault. She described the vehicle as a black, 4-door, "nicer car"

with a gray-black leather interior, a nice stereo system, and slightly tinted windows.

21.     MITCHELL asked Witness 1 if she had any active warrants, to which she

responded "yes." He also asked her if she had any drugs, to which she responded "yes." When

Witness 1 tried to open the door to jump out, MITCHELL grabbed her hair to prevent her from

leaving the vehicle and said he was taking her to jail. Witness 1 knew the arrest procedure and

knew something was wrong because he did not call for a police officer.

22.     MITCHELL drove them to a park near Interstate 71 and Greenlawn Avenue

(believed by your Affiant to be Berliner Park), where he parked and asked Witness 1 if she was

going to make this easy or hard. MITCHELL pulled Witness 1's hair, turned her around in the

front passenger seat, placed a handcuff on her wrist, fastened the other handcuff to the grab

7

handle above the passenger side door, and then forced his penis into her anus "hard." During the assault, MITCHELL turned up the car stereo and placed his hand over Witness 1's mouth when she began screaming.

23.     Witness 1 told investigators that as MITCHELL was penetrating her anus, he pushed her chest against the back of the passenger side front seat and forced her against the headrest, while placing his other hand on the headrest to brace himself, such that she could see MITCHELL's hand. Witness 1 noted that MITCHELL had swollen or rather large knuckles. Witness 1 also recalled that MITCHELL had an impression or indentation on his finger as though he had removed a ring that was on his finger for a period of time. She also remembered a black bag that was on the floor behind the driver's seat, which MITCHELL began to reach into prior to the sexual assault. She further recalled the seat material not being fabric but, rather, leather or something smooth, as she remembered "sticking" to them. She recalled seeing two cell phones that were sandwiched together in the center console cup holder of the vehicle. (Your Affiant knows that MITCHELL was issued a CPD cell phone (**assigned call number 614-359-2897**) (the Device) and also had a personal cell phone (assigned call number 614-679-0788) during this timeframe.)

24.     When MITCHELL was finished, he unlocked the handcuffs using a pen-style handcuff key. Witness 1 told investigators that her pants were off while the attack occurred, and when MITCHELL had finished, he pulled up his pants and shoved her out of the vehicle, leaving her in the public park without pants. Witness 1 stated that MITCHELL took her pants with him. She described her pants as black leggings made of a stretchy material with a design on the legs. Witness 1 also remembered that MITCHELL was wearing a T-shirt and what she described as pants or shorts with pockets on the side (i.e., cargo pants/shorts) and smelled of expensive

8

cologne. She recalled that MITCHELL was wearing a baseball cap that was black and white in color and had a bird "like an eagle" or something similar.

25.     On or about September 11, 2018, Witness 1 identified CPD Officer Andrew MITCHELL from a photo array as the person who sexually assaulted her on two occasions as described above.

26.     CPD payroll records reveal that MITCHELL's duty hours were 9:00am – 5:00pm with Saturday and Sunday as his days off. Witness 1 indicated that the June/July 2018 sexual assault occurred near dusk.

27.     A search of the Ohio Law Enforcement Gateway (OHLEG) database further reveals that MITCHELL owns a dark gray 2013 Cadillac XTS, VIN #2G61P5S32D9107621, Ohio license plate number EPJ9719 (purchased on May 18, 2015), registered to him at 6249 Howard Road Sunbury, Ohio 43074. This vehicle has significant similarities (i.e., 4-door, darker, "nicer car" with slightly tinted windows) to the vehicle described by Witness 1 used in the June/July 2018 sexual assault.

28.     On or about September 24, 2018, Witness 1 was shown an image of a 2013 Cadillac XTS by investigators. Witness 1 affirmed that the image depicted the vehicle that she had been in when she was sexually assaulted by MITCHELL in June/July 2018. Witness 1 became visibly upset and began to cry after viewing the image of the vehicle.

### Criminal Investigation Involving Witness 3

29.     Previously, in the summer of 2018, the CPD Vice Unit and the New Salem Baptist Church Anti-Human Trafficking Ministry were collaborating on a project to address street prostitution in the North Linden area of Columbus, Ohio. During this project, on or about

July 18, 2018, Witness 3 was arrested by another CPD Vice Unit detective and charged with

soliciting. At the time of the arrest, Witness 3 provided the arresting officer with a false identity

of her cousin, "Witness 6". Subsequently, the arresting officer processed an arrest information

report and a misdemeanor summons utilizing the false information provided by Witness 3, which

ordered "Witness 6" in Franklin County Municipal Court on July 27, 2018 at 9:00am.

30.     While Witness 3's arrest was being processed, a church volunteer witnessed

MITCHELL siting in a chair and talking with Witness 3. Once Witness 3 was free to leave, the

church volunteer informed Witness 3 of the social services New Salem Baptist Church Anti-

Human Trafficking Ministry offered to women charged with prostitution offenses. During the

conversation, the church volunteer asked if "Witness 6" was her real name and she responded no,

and revealed her real name. Witness 3 told the church volunteer that she had only been out on

the street a couple of years and that the African-American who was sitting next to her inside the

church was one of her first tricks. According to the church volunteer, MITCHELL was the only

African-American officer in the room.

31.     On or about August 15, 2018, the CPD Vice Unit conducted another street

prostitution enforcement operation in collaboration with the New Salem Baptist Church. During

the operation, Witness 3 was again arrested and charged with loitering to engage in solicitation

by another CPD Vice Unit detective. The arresting officer brought Witness 3 to the New Salem

Baptist Church for arrest processing. During the processing, Witness 3 told arresting officers

that she had been having a sexual relationship with a CPD officer named Andy Mitchell.

32.     As a result of the allegation described above, Witness 3 was interviewed by CPD

internal affairs sergeants and supervisory management. Approximately 4–5 years ago, Witness 3

met MITCHELL through her cousin, Witness 6, who rented an apartment from MITCHELL at

10

1994 or 1995 Denune Avenue, and later on Oakland Park. At the time, Witness 3 was in need of an apartment and began renting 1993 Denune from MITCHELL for approximately 6–7 months. (Your Affiant knows that MITCHELL has owned 1975 – 1999 Denune Avenue since May 16, 2000, and 1934 – 1940 Oakland Park Avenue from May 4, 1999 until it was sold on April 4, 2017.)

33.     Witness 3 told investigators that she began having sex for money when she began abusing prescription pills. MITCHELL would take Witness 3 to his apartment on Oakland Park that he called his "home away from home," where he would have vaginal sex with her, without a condom, and pay her $40.00 each time. After sex, MITCHELL would take Witness 3 to her apartment or a drug house to purchase pills. MITCHELL knew that Witness 3 used drugs, but she never did drugs in front of him. When Witness 3 was in physical need of pills to feed her drug habit, MITCHELL would drive her to a dope house to get pills before having sex. When MITCHELL picked up Witness 3, he would always be driving his pickup truck or newer black Cadillac.

34.     Witness 3 further told investigators that she knows that MITCHELL has rented properties to at least two other prostitutes (Witness 4 and Witness 5), who were having sex with MITCHELL for money.

35.     Witness 3 also told investigators that, while she was in custody at the Franklin County Correctional Center, a fellow inmate, Witness 5, approached her and stated that MITCHELL had called her and said that Witness 3 was "snitching" on him. As described above, the fellow inmate, Witness 5, was also a tenant of one of MITCHELL's properties.

36.     A search of the Franklin County Auditor and Recorders Office websites revealed that MITCHELL has purchased and/or sold over 40 rental properties since the 1990s. The

11

Franklin County Auditor's website shows the rental contact information as being "Andrew K. Mitchell, 6429 Howard Road, Sunbury, Ohio 43074," MITCHELL's primary residence, with a telephone number of 614-679-0788.

## Eviction Notices

37.　This investigation has identified several prostitutes who engaged in sex acts for money with MITCHELL and/or were tenants in MITCHELL's rental properties.  A search of Franklin County Municipal Court records revealed the following eviction notices were filed by MITCHELL, who used an address of "6429 Howard Road, Sunbury, Ohio 43074," MITCHELL'S primary residence:

| DATE | EVICTION DEFENDANT | PROPERTY ADDRESS |
|---|---|---|
| 07/01/2014 | Witness 3 | 1999 Denune Avenue, #B |
| 10/13/2016 | Witness 6 | 1938 Oakland Park Avenue, Apt. B |
| 12/22/2016 | Witness 4 | 1938 Oakland Park Avenue, Apt. D |
| 12/08/2017 | Witness 4 | 1975 Denune Avenue |

## Social Media-Related Investigation

38.　During the course of this investigation, investigators have learned of at least two women who posted on social media that they had rented properties from MITCHELL, and that he had propositioned them for sex in exchange for rent.

39.　Evidence obtained during this investigation has revealed that MITCHELL is connected with Witness 3, as well as Witness 5 and Witness 6 (discussed above), and other potential witnesses on Facebook (i.e., Facebook friends with).  Your Affiant knows that individuals often access and communicate on Facebook via their cellular phones.

## **Additional Ongoing Investigation**

40.     October 3, 2018, investigators are aware of approximately twelve additional women who have reported information regarding alleged misconduct by MITCHELL.

41.     Your Affiant knows that the Device was assigned to CPD Vice Unit Detective Andrew K. MITCHELL by CPD to be utilized as his work-related cellular phone to carry out his official duties.  The Device is currently in the lawful possession of the Columbus Division of Police property room.  It came into the CPD's possession in the following way: the Device was seized from MITCHELL, pursuant to CPD official policy, on or about August 23, 2018. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

42.     In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the CPD.

## **TECHNICAL TERMS**

43.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some

14

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

44. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at http://www.apple.com/iphone, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device as an instrumentality to commit a crime, particularly over the Internet, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also

as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

47. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

49. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

50. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These

18

documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Robert D. Bogner
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on October ___4___, 2018.

Honorable Chelsey M. Vascura
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### PROPERTY TO BE SEARCHED

The property to be searched is an **Apple iPhone 6S, IMEI #359486085729315,** hereinafter the "Device."  The Device is currently located at the Columbus Division of Police property room in Columbus, Ohio.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### PROPERTY TO BE SEIZED

1.      All records on the Device described in Attachment A that relate to violations of
18 U.S.C. § 242 (deprivation of rights under color of law) and/or 18 U.S.C. § 1951 (Hobbs Act
extortion), including but not limited to:

  a.  Records and information relating to financial institutions and other individuals or
      businesses with whom a financial relationship exists,

  b.  Records and information relating to the receipt, deposit, or transmission of funds
      of any kind, including but not limited to bank records, checks, deposit tickets,
      money orders, wire transfers, credit card bills, account information, receipts, and
      other financial records and information;

  c.  Records and information relating to cellular phone usage or electronic device
      usage, including account statements and call detail records, as well as indicia of
      the use or ownership of same;

  d.  Records and information relating to e-mail accounts and social media accounts, as
      well as indicia of the use or ownership of same;

  e.  Records and information relating to real estate transactions, tenant listings,
      invoices, receipts, records of eviction, and tax returns;

  f.  Records and information relating to names, addresses, telephone numbers, and
      other contact information of tenants/victims, including but not limited to logs,
      notebooks, ledgers, planners, notes, and other documents and records identifying
      victims/tenants, as well as photographs, videotapes, film, undeveloped film and
      the contents therein;

g.  Records and information relating to the identity or location of any additional suspects;

h.  The opening, search, and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained;

i.  Records and information relating to any storage facilities;

j.  Any and all other records or information relating to violations of 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 1951 (Hobbs Act extortion), and related offenses.

2.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2